*This opinion is subject to revision before final publication in the Pacific Reporter*

**2024 UT 24**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

LINZI LABRUM,
*Petitioner*,

*v.*

UTAH STATE BAR,
*Respondent*.

No. 20230173
Heard December 15, 2023
Filed July 18, 2024

On Petition for Review of Utah State Bar's Decision on Attorney
Applicant Application

Attorneys*:

Emily Adams, Freyja Johnson, Rachel Phillips Ainscough,
Bountiful, for petitioner

Emily Lee, Maribeth LeHoux, Nancy Sylvester, Salt Lake City,
for respondent

CHIEF JUSTICE DURRANT authored the opinion of the Court,
in which ASSOCIATE CHIEF JUSTICE PEARCE and JUSTICE PETERSEN
joined.

JUSTICE HAGEN authored a dissenting opinion, in which
JUSTICE POHLMAN joined.

---

\* Additional attorneys: Ann M. Taliaferro, Salt Lake City, for
amicus curiae Concord Law School at Purdue University Global, in
support of petitioner.

CHIEF JUSTICE DURRANT, opinion of the Court:

## INTRODUCTION

¶1   In *Kelly v. Utah State Bar*,[2] we established the standard for evaluating petitions for waiver of the rules that govern admission to the practice of law in Utah. We held in that case that "waiver of our rules is appropriate only in extraordinary cases where the applicant demonstrates by clear and convincing evidence that the purpose of the rule for which waiver is sought has been satisfied."[3] Petitioner Linzi Labrum now asks us to waive rules 14-704(c)(2) and 14-704(c)(3) of the Utah Supreme Court Rules of Professional Practice, which require graduates of law schools that are not accredited by the American Bar Association to practice law in another state for ten years before becoming eligible to take the Utah bar exam. We hold that Labrum has satisfied the burden of proof that *Kelly* places upon her and grant her petition for waiver.

## BACKGROUND

¶2   In 2013, Petitioner Linzi Labrum wanted to go to law school. This wasn't a new desire; after earning her bachelor's degree from the University of Utah in 2000, she took the Law School Admission Test (LSAT) and was accepted by two law schools. But there were obstacles that prevented her from going to law school in 2000, and so too were there obstacles in her path thirteen years later.

¶3   In 2013, Labrum lived in Roosevelt, Utah, with her spouse and four minor children. The nearest law schools to her—at Brigham Young University and the University of Utah—were each more than a two-hour drive away. A daily four-hour commute would have conflicted with Labrum's responsibilities as the main caregiver for her family. Nor was it feasible for Labrum to pick up and move to Provo or Salt Lake City, because her husband's work commitments kept the family in Roosevelt.

¶4   After some contemplation, Labrum took what she considered to be the only option available to her at the time: she enrolled in an online *juris doctor* (J.D.) program at Concord Law School at Purdue University Global (Concord). This program had two advantages. First, it was entirely online, which meant that

---

2   2017 UT 6, 391 P.3d 210.

3   *Id.* ¶ 1.

Labrum could complete her coursework without leaving Roosevelt. Second, it was a part-time program that traded a lighter courseload in exchange for adding a fourth year onto the traditional three-year law school education.

¶5    Labrum graduated from Concord in 2017. She applied to take the Utah bar exam shortly thereafter. But the Utah State Bar (the Bar[4]) denied her application because Concord was not accredited by the American Bar Association (ABA), which at that time refused to accredit online law schools.[5] Under rule 14-703(a)(3) of the Utah Supreme Court Rules of Professional Practice, which govern admission to the practice of law in Utah, recent graduates of law schools unaccredited by the ABA are not permitted to take the bar exam.[6]

¶6    Labrum petitioned this court for waiver of that rule. We considered her petition but ultimately denied it, advising Labrum

---

[4]    The word "bar" is used colloquially to refer to several distinct things within the legal field. It can refer to the bar exam ("She sat for the bar"), admitted attorneys as a group ("She was admitted to the bar"), or the organization that we have enlisted to help us perform our responsibility to oversee the practice of law in Utah ("The Bar denied her request"). For simplicity, we use the standalone word "Bar" only for the Utah State Bar, which is the respondent in this case.

[5]    The Council of the ABA Section of Legal Education and Admissions to the Bar is the official accrediting agency of J.D. programs in the United States. *See Guide to Schools Seeking ABA Approval*, A.B.A., https://www.americanbar.org/groups/legal_education/accreditation/schools-seeking-aba-approval/ (last visited July 10, 2024). The Council and the Section are technically "separate and independent from the ABA, as required by [U.S. Department of Education] regulations." *Id.* For ease of reference, we and the dissent simply refer to the accrediting agency as the ABA.

[6]    *See* UTAH SUP. CT. R. PRO. PRAC. 14-703(a)(3). This rule requires student applicants to have "graduated with a First Professional Degree in law from an Approved Law School." *Id.* An Approved Law School is elsewhere defined as "a law school which is fully or provisionally approved by the ABA." *Id.* R. 14-701(e).

that she should consider petitioning our rulemaking committee for a change to the rule that blocked her application.[7]

¶7     Labrum did not pursue a rule change but continued to pursue her goal of becoming a lawyer. Still living in Roosevelt, she worked as a law clerk and began training as a mediator. After she completed her training, she became a court-rostered mediator and started her own mediation business. Labrum also studied for the California bar exam, the only bar exam that her degree entitled her to take. She passed that bar exam in 2020. Upon being admitted as an attorney in California in 2021, Labrum asked the Utah State Bar if she was now eligible as an attorney applicant under rule 14-704(c). The Bar informed her that she was not. In so doing, the Bar relied upon rule 14-704(c)(3), which requires attorneys who graduated from law schools unaccredited by the ABA to practice law in another jurisdiction for ten years before they are eligible to take the Utah bar exam.

¶8     Once again, Labrum did not take this rejection sitting down. Now that she was admitted as an attorney in California, our rules allowed her to represent clients in Utah as a supervised pro bono attorney.[8] Labrum began working in that capacity with the guidance of a Utah Legal Services attorney, and she represented several clients in the Roosevelt area in domestic matters. She also began working as a law clerk and mediator for the law firm Scalley Reading Bates Hansen & Rasmussen.

¶9     By 2023, two things had changed. First, Labrum now had almost three years of Utah legal experience under her belt. Second, the national attitude toward online law schools had evolved.[9]

---

[7]     *Order*, *Linzi Labrum-Garner v. Utah State Bar*, Case No. 20190015-SC (Jan. 2, 2020) ("[Labrum's petition] raises interesting and important issues that may merit attention. But a majority of the Court believes that these issues are best dealt with, if at all, by reexamining admission standards generally, and not by waiving long-standing rules that were in place before [Labrum] sought admission to the Bar.").

[8]     *See generally* UTAH SUP. CT. R. PRO. PRAC. 14-803.

[9]     *See* Nina A. Kohn, *Online Learning and the Future of Legal Education: Symposium Introduction*, 70 SYRACUSE L. REV. 1, 3 (2020) [hereinafter Kohn, *Online Learning*]. For a comprehensive history of
(continued . . .)

When Labrum was searching for a law school in 2014, the ABA permitted law schools to administer only fifteen credits worth of classes online.[10] As graduation from a J.D. program usually requires approximately ninety credits,[11] this meant that students needed to take classes on campus for the vast majority of their degree. But in 2018, the ABA increased the number of permissible online credits to around thirty,[12] and in 2023, it increased that number again to approximately forty-five.[13] Under these new rules, law students may study remotely for as many as half of the hours required for their degree.

¶10 As the ABA changed its rules to allow more online instruction, it also granted specific schools permission to depart from those rules and offer hybrid or fully online J.D.'s. In 2015 the Mitchell Hamline School of Law in Minnesota began offering an ABA-accredited hybrid J.D. program, with students studying

---

this change, see Yvonne M. Dutton et al., *Assessing Online Learning in Law Schools: Students Say Online Classes Deliver*, 96 DENV. L. REV. 493 (2019).

[10] *See* Kohn, *Online Learning*, at 4.

[11] *See* STANDARDS & R. OF PROC. FOR APPROVAL OF L. SCHS., Standard 311, (A.B.A. 2023), available at https://www.americanbar.org/content/dam/aba/administrativ e/legal_education_and_admissions_to_the_bar/standards/2023-2024/2023-2024-aba-standards-rules-for-approval.pdf [hereinafter A.B.A. STANDARDS 2023] (last visited July 10, 2024) ("A law school must require, as a condition for graduation, successful completion of a course of study of not fewer than 83 credit hours.").

[12] STANDARDS & R. OF PROC. FOR APPROVAL OF L. SCHS., Standard 306, (A.B.A. 2018), available at https://www .americanbar.org/content/dam/aba/publications/misc/legal_ education/Standards/2018-2019ABAStandardsforApprovalof LawSchools/2018-2019-aba-standards-rules-approval-law-schools -final.pdf (last visited July 10, 2024) ("A law school may grant a student up to one-third of the credit hours required for the J.D. degree for distance education courses qualifying under this Standard.").

[13] A.B.A. STANDARDS 2023, Standard 306 ("A law school may grant a student up to 50 percent of the credit hours required for the J.D. degree through Distance Education Courses . . . .").

remotely and making only occasional appearances on campus.[14] By 2020 another four such hybrid programs had been accredited,[15] and in 2021 the ABA accredited its first fully online J.D. curriculum.[16] Several other fully online programs have gained accreditation in the years since.[17] While Concord has not been accredited by the ABA, it has been accredited by the State of California since 2020.[18]

¶11 Armed with evidence of these changes, Labrum again applied to take the Utah bar exam. But the Bar again denied her application, as her three years of legal experience did not meet the ten-year practice requirement imposed by 14-704(c)(3).[19] Labrum again petitioned this court for waiver, citing her experience and the

---

[14] Karen Sloan, *First All-Remote, Full-Time Law Degree with ABA Blessing Set to Start Next Fall*, REUTERS (Sept. 9, 2023), https://www.reuters.com/legal/government/first-all-remote-full-time-law-degree-with-aba-blessing-set-start-next-fall-2023-09-29/ [hereinafter Sloan, *First*]; *J.D. Enrollment Options*, MITCHELL HAMLINE SCH. OF L., https://mitchell hamline.edu/academics/j-d-enrollment-options/ (last visited July 10, 2024).

[15] Kohn, *Online Learning*, at 1 n.1.

[16] *St. Mary's Law Launches the Nation's First Fully Online J.D. Program Approved by the ABA*, ST. MARY'S UNIV. (Sept. 14, 2021), https://www.stmarytx.edu/2021/online-jd-launch/ (last visited July 10, 2024).

[17] Sloan, *First*. This shift in practice reflects a shift in opinion on the merits of online legal instruction, as well as a commendable desire to make legal education more accessible to nontraditional students. *See* Victoria Sutton, *Asynchronous, E-Learning in Legal Education: A Comparative Study with the Traditional Classroom*, 70 SYRACUSE L. REV. 143, 164 (2020) (finding that asynchronous and hybrid classes deliver experiences and learning outcomes that are "close to a normal distribution for . . . traditional courses").

[18] *See Law Schools*, CAL. ACCREDITED L. SCHS., https://calawschools.org/law-schools/ (last visited July 10, 2024) (Concord has recently changed its name to Purdue Global Law School).

[19] The issue of Concord's status as a qualifying Unapproved School wasn't discovered until later in the litigation, as is discussed below, *infra* ¶ 20 n.41.

change in national circumstances as factors that distinguished this petition from the one we denied in 2018. We have jurisdiction to hear petitions for waiver under article VIII, section 4 of the Utah Constitution, and subsection 78A-3-102(2) of the Utah Code.[20]

## STANDARD OF REVIEW

¶12 Petitions for waiver of our rules of admission come to this court without having been heard by any other court or administrative body.[21] We thus review these petitions in the first instance.[22]

## ANALYSIS

¶13 The Utah Constitution "imposes on this court the duty, and grants it the concomitant authority, to govern the practice of law within the state of Utah."[23] To carry out that duty, we have adopted the Utah Supreme Court Rules of Professional Practice "as predictable, objective standards" that, "in the majority of cases, accurately gauge an applicant's competence to practice law in this jurisdiction."[24] But, as that statement implies, there are cases "where the goal of ensuring competent representation would not be advanced by a strict application of the rules governing admission."[25] In *Kelly v. Utah State Bar*, we established the standard by which an individual who finds their admission to the Utah bar

---

[20] *Kelly v. Utah State Bar*, 2017 UT 6, ¶ 6, 391 P.3d 210.

[21] *See* UTAH SUP. CT. R. PRO. PRAC. 14-702(f) ("Neither the Bar nor its representatives has authority to waive any rule. Waiver of any rule may only be obtained by petitioning the Supreme Court.").

[22] *See In re Anthony*, 2010 UT 3, ¶¶ 11–12, 225 P.3d 198 ("[A]s a matter of constitutional law, authority over admissions in this state remains with this court unless it has been delegated away. And our own rules make clear that we have not yet delegated the right to waive admissions requirements.").

[23] *In re Anthony*, 2010 UT 3, ¶ 11, 225 P.3d 198; *see also* UTAH CONST. art. VIII, § 4 ("The Supreme Court by rule shall govern the practice of law, including admission to practice law and the conduct and discipline of persons admitted to practice law.").

[24] *Kelly v. Utah State Bar*, 2017 UT 6, ¶¶ 8, 12, 391 P.3d 210 (cleaned up).

[25] *In re Anthony*, 2010 UT 3, ¶ 15.

blocked by one of our rules may petition for a waiver of that rule: "[A] waiver is appropriate only in extraordinary cases where an applicant demonstrates by clear and convincing evidence that the purpose of a particular rule contemplated for waiver has been satisfied."[26] That holding establishes a two-step analysis.

¶14 In the first step, applicants must show by clear and convincing evidence that they have satisfied the purpose of the rule for which they request waiver. In evaluating that showing, "we will not merely consider whether an applicant has satisfied the purpose of a particular rule—which may be narrow."[27] We will also "consider more globally an applicant's competence to practice law."[28] This focus on competence mirrors the purpose of our rules of admission as a whole, which is "to protect the citizens of Utah by ensuring . . . that the people of this state may rely on admitted attorneys for competent and ethical representation."[29] With that goal in mind, we "will not waive a rule and pave the way for an applicant to practice law . . . unless we are satisfied that the applicant possesses the needed skill, knowledge, and ability to ethically represent Utah citizens."[30]

---

[26]  *Kelly*, 2017 UT 6, ¶ 10.

[27]  *Id.* ¶ 11.

[28]  *Id.* The dissent argues that this language applies only to the determination of whether an applicant's circumstances are extraordinary. *Infra* ¶ 80. While that conclusion isn't without support, we don't believe the issue is so clear cut. *Kelly* uses the phrase "extraordinary cases" in reference to both steps of its analysis. This can be seen in the quote that the dissent highlights: in "assessing whether a particular case is extraordinary," *Kelly* "consider[s] whether an applicant has satisfied the purpose of a particular rule." *Kelly*, 2017 UT 6, ¶ 11. Moreover, where one of the overarching purposes of our rules is to ensure competence, it seems illogical to preclude any discussion of competence from the analysis of whether an applicant has satisfied a rule's purpose.

[29]  *In re Anthony*, 2010 UT 3, ¶ 15.

[30]  *Kelly*, 2017 UT 6, ¶ 11.

¶15 In the second step, applicants must convince us that their circumstances are unusual.[31] This is in one sense a definitional requirement, as extraordinary cases are necessarily uncommon ones. But it also serves an important purpose regarding the waiver process writ large. We have "no desire to encourage a flood of individualized waiver petitions" and are disinclined to expend the resources necessary to engage in a "case-by-case evaluation of the merits of numerous unsuccessful applicants."[32] Requiring that an applicant's circumstances are truly extraordinary helps to assure us that there are few others who can stand in the applicant's shoes and that granting a waiver in this case is unlikely to open the floodgates. Requiring applicants to demonstrate extraordinary circumstances also protects the distinction between the waiver process and the rulemaking process. If an applicant is but one of many in a class of others who believe that they are being unfairly excluded by our current rules of admission, that applicant's remedy is to petition for a change of those rules, not to seek an individualized waiver.

¶16 If an applicant succeeds in making the two showings that *Kelly* requires, we "hold absolute discretion" to waive our admission rules.[33] But we reemphasize what we said in that case: "Future petitioners are on notice that we will not open the

---

[31]  *Id.* ¶ 12 ("A guiding star of [the waiver] analysis is that the applicant's background and experience must distinguish him [or her] from other applicants to merit waiver.").

[32]  *In re Anthony*, 2010 UT 3, ¶¶ 14–15.

[33]  2017 UT 6, ¶ 12. Readers may wonder how we reconcile stating that our discretion to grant waivers is absolute, while at the same time stating that there are limits on when waivers will be granted. It's a fair question. *Kelly*'s assertion of the scope of our control over the waiver process is accurate. In both that case and in *In re Anthony* we articulated the institutional interests that have led us to settle upon the current waiver process, but nothing prevents a future court from deciding to change it.

Our description of the waiver process is thus best understood not as an actual limit on our own discretion, but rather as a guide for potential waiver seekers. While in theory we could grant waiver for any reason, applicants should frame their petitions for waiver in accordance with *Kelly*'s two-part standard and should expect to have their petition denied if they are unable to clear the high bar that case sets.

courthouse doors to grant waivers as a more convenient alternative to compliance with the rules."[34] And just as we have the discretion to grant a waiver under the appropriate circumstances, so too do we have the discretion to "decline to waive our rules" and require that an applicant "demonstrate his [or her] competence by satisfying the rule" at issue.[35]

¶17   Before we address Labrum's petition for waiver, we pause to explain the rules that prevent her from gaining admission in the first place. Because Labrum is already an attorney in California, her application to take the bar exam in Utah is governed by rule 14-704 of the Utah Supreme Court Rules of Professional Practice. That rule separates attorney applicants based on the category of law school where they earned their J.D. degree.[36]

¶18   Attorney applicants who received their J.D. from an ABA-accredited law school, which our rules refer to as an Approved Law School,[37] can apply to take the bar exam under rule 14-704(a). Attorney applicants who received their J.D. from a law school not accredited by the ABA, referred to as an Unapproved Law School,[38] must apply to take the bar exam under rule 14-704(c). This second scenario requires us to delve a bit deeper into the rules.

¶19   By the plain language of our rules, an Unapproved Law School is "a law school that is not fully or provisionally [accredited] by the ABA."[39] But not all Unapproved Law Schools are treated

---

[34]   *Id.*

[35]   *Id.*

[36]   Technically speaking, rule 14-704 categorizes applicants based on where they received their "First Professional Degree," which is elsewhere defined as "a degree that prepares the holder for admission to the practice of law (e.g.[,] juris doctorate) by emphasizing competency skills along with theory and analysis. An advanced, focused, or honorary degree in law is not recognized as a First Professional Degree (e.g.[,] master of laws or doctor of laws)." UTAH SUP. CT. R. PRO. PRAC. 14-701(q). As the J.D. is both the most familiar First Professional Degree and the degree that Labrum earned, we use it as a stand-in for the larger category.

[37]   *Id.* R. 14-701(e).

[38]   *Id.* R. 14-704(pp).

[39]   *Id.*

equally. "For an Unapproved Law School's graduates to be eligible for admission, the law school must be [1] accredited in the jurisdiction where it exists,[40] [2 provide legal education that is the substantial equivalent of the legal education provided by an Approved Law School, and [3] not be based on correspondence or internet study."[41] The rule thus makes an internal distinction between qualifying Unapproved Law Schools, whose graduates can qualify for admission, and nonqualifying Unapproved Law Schools, whose graduates are denied that privilege. For simplicity, we refer to the latter category as Nonqualifying Law Schools.

¶20 Unfortunately for Labrum, the school where she earned her J.D. is a Nonqualifying Law School for two reasons: first, when Labrum attended Concord, it was not accredited by its home state of California; and second, Concord's J.D. program consisted entirely of online classes. So to be considered an attorney applicant under rule 14-704(c), Labrum must be granted a waiver of subsection (c)(2)'s incorporated requirement that she graduate from an Unapproved Law School, rather than a Nonqualifying Law School.[42]

---

[40] Some states, most notably California, provide state-level accreditation of law schools. *See Law Schools*, STATE BAR CALIFORNIA, https://www.calbar.ca.gov/Admissions/Law-School-Regulation/Law-Schools#cbe (last visited July 10, 2024) (listing the law schools that are accredited by the California State Bar's Committee of Bar Examiners). This makes it possible for a California based school to be unaccredited by the ABA, but nonetheless accredited in the jurisdiction where it exists.

[41] UTAH SUP. CT. R. PRO. PRAC. 14-701(pp).

[42] In its letter denying Labrum's most recent application to take the bar exam, the Utah State Bar cited only subsection (c)(3) as grounds for its denial. This was because the Bar mistakenly assumed that Concord University met the requirements of a qualifying Unapproved Law School—a mistake that wasn't discovered until the Bar was preparing its brief in this case. Labrum contends that, because it failed to do so earlier, the Bar should be estopped from now raising subsection (c)(2) as an additional ground for denying her application.

We decline to adopt Labrum's argument because we do not believe that the theory of estoppel is applicable to the waiver

(continued . . .)

¶21 Subsection (c)(3) also stands in the way of Labrum's application. For attorney applicants from an Unapproved Law School to be eligible to take the bar, they must have "been admitted to the practice of law before the highest court of a U.S. state, territory[,] or the District of Columbia for no fewer than ten years, and [have] been Actively and lawfully engaged in the Full-time Practice of Law in one or more jurisdictions where licensed for any ten of the eleven years immediately preceding the filing" of their application to sit for the bar exam.[43] Labrum was admitted to the practice of law in California only in April 2021, and since then she has been working as a non-attorney in Utah.

¶22 So to sit for the Utah bar exam as an attorney applicant Labrum must receive two waivers: first, a waiver of subsection (c)(2)'s requirement that she have graduated from an Unapproved Law School; and second, a waiver of subsection (c)(3)'s requirement that she have practiced law in California for at least ten years. To earn those dual waivers, Labrum must satisfy the two-part *Kelly* test: first, by showing by clear and convincing evidence that she satisfies the purposes of the rules at issue; and second, by showing that she is an extraordinary candidate whose "background and experience . . . distinguish [her] from other applicants."[44]

## I. LABRUM HAS SHOWN BY CLEAR AND CONVINCING EVIDENCE THAT SHE SATISFIES THE PURPOSES OF THE RULES FOR WHICH SHE SEEKS WAIVER

¶23 The purposes of subsections (c)(2) and (c)(3) are easiest to understand if we start from a broad perspective. The overarching purpose of our rules of admission "is to protect the citizens of Utah by ensuring, to the best of our ability, that the people of this state may rely on admitted attorneys for competent and ethical

---

petition process. The fundamental purpose of our rules of admission is to "protect the citizens of Utah" from the dangers posed by "incompetent and unethical representation." *In re Anthony*, 2010 UT 3, ¶ 15. Allowing a potentially incompetent or unethical applicant to gain admission simply because the rule that would otherwise disqualify them wasn't cited in the Bar's denial letter would risk undermining that purpose.

[43]  UTAH SUP. CT. R. PRO. PRAC. 14-704(c)(3).

[44]  *Kelly*, 2017 UT 6, ¶ 12.

representation."[45] Our rules seek to accomplish this goal of ensuring competence and ethics by classifying applicants based on their education and experience and then setting out different paths to admission for each class.

¶24 For example, rule 14-703 sets out the path for students who have graduated from an ABA-accredited law school. We are confident that ABA-accredited law schools give their students a solid legal education. So we do not require graduates of those schools to gain any additional legal experience; if they can pass the bar exam—which tests competence—and the MPRE[46]—which tests knowledge of the ethics rules—they are eligible for admission.[47]

¶25 Contrast that with the pathway to admission set out for graduates of Unapproved Law Schools by rule 14-704(c). Because Unapproved Law Schools, for one reason or another, don't meet the ABA's accreditation standards, we have less confidence in the quality of education they provide. So we require graduates of those schools to practice in another jurisdiction for at least ten years, with the expectation that those years of experience will fill in any gaps that were left by their potentially sub-par education.[48] And those

---

[45] *In re Anthony*, 2010 UT 3, ¶ 15, 225 P.3d 198.

[46] MPRE refers to the Multistate Professional Responsibility Examination, a standardized test that quizzes prospective lawyers on their knowledge of the ABA's Model Rules of Professional Conduct, Model Code of Judicial Conduct, and other relevant laws and principles. *About the MPRE*, NAT'L CONF. BAR EXAM'RS, https://www.ncbex.org/exams/mpre/about-mpre (last visited July 10, 2024).

[47] Student applicants under rule 14-703, as well as all other types of applicants, must also comply with other requirements, such as being at least twenty-one years old, paying the relevant fees, and passing the Character and Fitness evaluation. *See* UTAH SUP. CT. R. PRO. PRAC. 14-703 to 705. These other requirements are not at issue in this case.

[48] A prior version of our rules of admission allowed graduates of non-ABA-accredited law schools to sit for the Utah bar exam after only five years of practice. *See In re Anthony*, 2010 UT 3, ¶ 2. After a series of changes, the practice requirement was increased to ten years in 2010. *See id.* ¶ 4; UTAH SUP. CT. R. PRO. PRAC. 14-704(c)

(continued . . .)

years of practice do not guarantee admission: applicants who satisfy rule 14-704(c) must still pass the bar exam and MPRE.

¶26   That brings us to the issue of Nonqualifying Law Schools. As discussed, graduates of Nonqualifying Law Schools are ineligible for admission under rule 14-704(c). In fact, our current rules provide no pathway for such graduates to practice law in Utah at all, short of earning a second J.D. at an Approved or Unapproved Law School. This provides a floor for the Unapproved category, allowing our rules to exclude from admission graduates of schools that we fear may have provided a wholly deficient education.

¶27 This landscape of educational and experiential requirements informs our assessment of the purpose of the subsections at issue. The purpose of (c)(2) is to ensure that applicants for admission have received an education of sufficient quality that, when combined with the practice requirement and passage of the bar exam and MPRE, we can be confident that they have learned the material that will help them offer competent and ethical representation. And the complementary purpose of (c)(3) is to ensure that applicants for admission have enough practical experience to make up for whatever gaps their education, passage of the bar exam and MPRE may have left unfilled.

### A. Labrum Has Shown by Clear and Convincing Evidence that She Satisfies the Purpose of Rule 14-704(c)(2)

¶28 Determining whether Labrum's education satisfies the purpose of subsection (c)(2) is a difficult undertaking. Learning is a subjective endeavor, and the pedagogy that one student finds

---

(2010). The available committee notes do not explain the rationale behind this increase. While we are always cognizant of our obligation to maintain high standards for admission, we are also aware that setting the bar too high risks excluding competent and much-needed legal practitioners. We thus refer to our rules committee and the Utah State Bar the question of whether we should shorten the required practice period. For similar reasons, we also refer the issue of whether there should be a pathway to admission for graduates of Unapproved Law Schools who do not satisfy the criteria imposed by rule 14-701(pp).

engaging another student may find nauseating.[49] To help average out subjective factors, and to provide a relevant benchmark, we compare Concord objectively with the educational standards imposed by the ABA on accredited law schools.

¶29   The comparison begins with the scope and duration of the education. Based on the information that Concord, as *amicus curiae*, provides, the scope of education is relatively equal; the curriculum at Concord covers all the topics that the ABA requires accredited schools to cover, such as contracts, criminal procedure, torts, and so on. The duration of education is likewise comparable. The ABA requires law students to take at least eighty-three credits,[50] which amounts to just over 3,700 hours of instruction and study. Concord requires ninety-two credits, which, by Concord's accounting, amounts to just over 4,100 hours of instruction and study.

¶30   Of course, scope and duration are no guarantee of a quality education. For objective measures of quality, we look to metrics of student outcomes, such as bar exam passage rates and attorney discipline rates. Here the comparison is decidedly less equal. While Concord's current first-time bar exam passage rates are at or near the average for Approved Law Schools in California, at the time of Labrum's graduation they were significantly below that mark.[51] Were an accredited law school to have graduates failing the bar

---

[49]   Toombs: [Law Professor] Kingsfield drove him mad. He's driven a lot of lawyers mad over the past 40 years that he's been teaching here. I heard he ripped up a [first-year law student] this morning so bad, the guy lost his breakfast.

Hart: That's true. That was me.

THE PAPER CHASE (20th Century Fox 1973).

[50]   A.B.A. STANDARDS 2023, Standard 311.

[51]   In the interest of fairness, we note that the relatively small number of Concord students who actually sit for the bar exam makes an accurate statistical comparison difficult. For example, only seven of Labrum's classmates took the California bar exam for the first time in October 2020. PURDUE GLOB. L. SCH., *Purdue Global Law School California Bar Exam Pass Rates*, (2024) www.concordlawschool.edu/documents/california-bar-exam-pass-rates.pdf (last visited July 10, 2024). The infirmity of this data prevents us from putting the same weight on it as does the dissent. *See infra* ¶ 66 n.67.

exam as often as Concord's graduates at the time of Labrum's graduation, it would be at serious risk of losing its accreditation for that reason alone.[52]

¶31 But when allowance is made for students who take the bar exam more than once, as Labrum did, the picture improves. The ultimate bar passage rate for students who graduated with or after Labrum is 69.6%, compared to the 75% two-year passage rate that the ABA requires.[53] And the statistics on attorney discipline and disbarment suggest that Concord's admitted graduates provide representation that is not significantly less competent or less ethical than that of their peers who graduated from ABA-accredited law schools.

¶32 These indicia do not persuade us that Concord provides a legal education on par with that given by ABA-accredited schools. But they do persuade us that the education that Concord provides is of sufficient quality that graduates, if given enough time to develop their skills and build experience, can provide competent and ethical representation. Labrum's education satisfies rule 14-704(c)(2)'s purpose, and in the context of a petition to waive our rules, that is what we require. We next ask whether Labrum's post-law-school experience satisfies the purpose of rule 14-704(c)(3), the second rule she asks us to waive.

### B. Labrum Has Shown by Clear and Convincing Evidence that She Satisfies the Purpose of Rule 14-704(c)(3)

¶33 Labrum acknowledges that the three years she has spent working in the legal field in Utah since becoming an attorney do not meet the standard imposed by subsection (c)(3). But as we outlined in *Kelly*, the real question is whether the Labrum can show that she satisfies the rule's purpose.[54] The purpose of (c)(3)'s

---

[52] A.B.A. STANDARDS 2023, Rule 15 (allowing sanctions, including the withdrawal of approval, to be placed upon a law school that is in "substantial or persistent noncompliance with one or more of the" accreditation standards).

[53] *California Business and Professions Code 6061.7a Disclosure*, PURDUE GLOBAL L. SCH. (Jan. 2024), https://www.purduegloballawschool.edu/business-and-professions-code-6061.7-disclosure.pdf (last visited July 10, 2024); A.B.A. STANDARDS 2023, Standard 316.

[54] *Kelly v. Utah State Bar*, 2017 UT 6, ¶ 11, 391 P.3d 210.

experience requirement is to ensure that applicants have enough experience to make up for whatever gaps their education at an Unapproved Law School may have left unfilled. Viewing Labrum's post-admission experience as a whole, we believe that she clears that bar.[55] Three points guide us to that conclusion.

¶34 The first point is that Labrum's legal experience has come from her work in Utah, as opposed to work in California or any other state. This has likely made Labrum more familiar with Utah's statutes, rules, and courtroom norms than we would expect a practitioner from another state to be. This knowledge of Utah law is also enhanced by Labrum's experience in multiple areas of the law.

¶35 The second point working in Labrum's favor is the nature of her work experience. Aside from her work handling pro bono cases, Labrum has not been practicing as an attorney. But she has nonetheless gone out of her way to work in a variety of fields that build skills and experiences relevant to being an attorney. This includes her years spent as a court-rostered mediator, a job that requires the same kind of interpersonal skills that attorneys use when interacting with clients.

¶36 This also includes her years spent as a law clerk in a firm. To be sure, clerks do not practice law. But their work nonetheless requires many of the same skills and much of the same knowledge as that performed by practicing attorneys. Clerks find relevant statutes, digest caselaw, draft motions, and write internal memos. Many law students who want to gain practical experience during

---

[55] Labrum argues that, when adding up her relevant experience, we should start the timer running from the moment that she graduated law school. But rule 14-704(c)(3) doesn't allow applicants to start accruing experience until after they are admitted to the bar of another state. We hold Labrum to the same standard and start the clock in April 2021.

That said, Labrum's pre-admission experience is not entirely irrelevant. During the four years between her graduation from Concord and her admission to the California bar, Labrum was consistently engaged in the legal field, working as both a clerk and as a mediator. Rule 14-704(c)(3) prevents us from giving these years the weight that they might otherwise deserve, but we are cognizant that Labrum has more experience than our formal analysis can account for.

law school work as clerks for a law firm precisely because it helps prepare them to be lawyers. And many firms prefer to hire new attorneys from among the ranks of their former clerks for the same reason; how someone performs as a law clerk is often predictive of how they will perform as an attorney.[56]

¶37  We also give weight to the fact that Labrum has spent considerable time working as a pro bono attorney. Like her role as a clerk, this work was supervised but nonetheless required her to exercise the skills required of an attorney, such as talking with clients, drafting motions, and appearing in court. We do not suggest that a few cases of pro bono work is enough for an otherwise unqualified candidate to earn a waiver of subsection (c)(3)'s practice requirement. But the decision to use her law degree to serve her fellow Utahns is another mark in Labrum's favor.

¶38  The final point we consider in evaluating whether Labrum is qualified to practice law in Utah is that a considerable number of Utah lawyers who have observed her work assure us that she is. Labrum's petition for waiver is accompanied by several letters of recommendation from individuals who have spent years supervising her work. These include the attorneys who observed and mentored her at Scalley Reading Bates Hansen & Rasmussen, as well as those at Utah Legal Services who guided her pro bono practice. The letters from both firms uniformly praise Labrum's competence and ethics and describe her as a zealous and compelling advocate. Equally impressive is that members of both firms put some skin in the game, expressing a desire to hire Labrum as an attorney if and when she is admitted to practice law in Utah. A final endorsement comes from the master mediator who trained Labrum in that field, and who praises her character and understanding of the law.

¶39  As above, the fact that a waiver petitioner comes bearing letters of recommendation is alone insufficient to persuade us of the applicant's qualifications. But if the lawyers who have supervised an applicant for years have enough confidence in her

---

[56]  This also helps to distinguish Labrum's case from the petitioner in *In re Gobelman*, 2001 UT 72, 31 P.3d 535, *distinguished on other grounds by In re Anthony*, 2010 UT 3, who was denied a waiver of the practice requirement because his "legally oriented" work as a court administrator did not persuade us of his competence. *Id.* ¶ 8.

work to place their own reputations behind her petition, we take those commendations seriously.[57]

¶40   We do not pretend that Labrum's time as a Utah law clerk, pro bono attorney, and mediator have given her experience equivalent to that received from a decade of practicing law in another jurisdiction. But the purpose of rule 14-704(c)(2) is satisfied when an applicant has enough experience to fill in the gaps in their education such that we can be assured of their competence and ethics. Labrum's years of supervised work have given her opportunities to develop her reasoning, hone her legal skills, and build her knowledge of Utah statutes and court rules. Her recommenders have watched her learn and develop, and they state that they are confident she is ready to provide the quality of representation that our rules demand. Based on her education, her experience, and those recommendations, we share that confidence.

## II. LABRUM HAS SHOWN THAT HER CASE IS AN EXCEPTIONAL ONE

¶41   The second step in *Kelly*'s analysis in many ways asks more of petitioners than the first. The "guiding star" of this step "is that the applicant's background and experience must distinguish [them] from other applicants to merit waiver."[58] If we are unconvinced of this, we will decline to grant a waiver, even if we believe that the petitioner is capable of providing competent and ethical representation.[59]

¶42   In this case, however, Labrum has successfully shown that her case merits a waiver of our rules. Her case is unusual for four

---

[57]   The dissent agrees that letters of recommendation are relevant to the competency determination but suggests that giving undue weight to such letters is "potentially problematic." *See infra* ¶¶ 112–14. While we understand this concern, we believe it can be mitigated. We give weight to the letters in this case in part because they come from lawyers who have observed Labrum's legal work. Letters that come from "influential people in [an applicant's] social network" would not warrant the same treatment. *See infra* ¶ 112.

[58]   *Kelly v. Utah State Bar*, 2017 UT 6, ¶ 12, 391 P.3d 210.

[59]   *See id* ¶ 19.

reasons.[60] First, the challenges that faced Labrum when she was trying to choose a law school in 2013 no longer exist. As discussed, in prior years the ABA refused to accredit online law schools.[61] This meant that potential law students who were unable to commute or relocate to a city with an accredited law school were forced to choose between attending an unaccredited online law school or finding another line of work.

¶43 That difficult choice became easier starting in 2015, when the ABA began to accredit hybrid J.D. programs. And it disappeared entirely in 2021, when the ABA accredited its first fully online law school. This change alone is insufficient to set Labrum apart from all other applicants; many of her classmates at Concord likely faced similar circumstances. But it serves to limit the number of others who could claim to stand in Labrum's shoes and contributes to showing that her case is unlikely to arise again.

¶44 The second factor that sets this case apart is Labrum's decision to seek legal work in Utah rather than in another state. Put simply, most law graduates who are admitted to practice law in a state will go on to practice law in that state. Labrum, by choosing to stay in Utah and work as a mediator, law clerk, and pro bono attorney, chose the path less traveled. That demonstrates an admirable dedication to service, and further contributes to making her case distinct.

¶45 The third factor working in Labrum's favor is related to the second: her demonstrable commitment to working in an area of Utah that is legally underserved.[62] The Utah State Bar cautions

---

[60] The reasons why Labrum's case is unusual have all arisen since her graduation from Concord. They serve to differentiate her current successful petition for waiver from her unsuccessful 2018 petition.

[61] *See supra* ¶¶ 9–10.

[62] We are aware of the pressing need for more lawyers to practice in rural areas of our state and are proud of the efforts so far undertaken to address that need. *See, e.g.*, Logan Cornett & Zachariah DeMeola, *Data from Utah's Sandbox Shows Extraordinary Promise, Refutes Fears of Harm*, UNIV. DENV. INST. FOR ADVANCEMENT AM. LEGAL SYS. (Sept. 15, 2021), https://iaals.du.edu/blog/data-utahs-sandbox-shows-extraordinary-promise-refutes-fears-harm

(continued . . .)

against weighing this point in Labrum's favor. In its eyes, doing so will incentivize future waiver seekers to make similar claims. And because a license to practice law in Utah is as effective in Salt Lake City as it is in Roosevelt, the Bar notes, there is nothing to stop Labrum or any other attorney from moving from one to the other as soon as our waiver is granted.

¶46 The Bar's point is valid, and we generally agree: an applicant's assertion that he or she wants to serve an underserved population contributes nothing to our determination of the applicant's competence. But where that assertion is supported by significant evidence, it can contribute to our determination of whether the applicant's case is an exceptional one. Labrum fits into that second category. Her connection to Roosevelt and the Eighth Judicial District writ large is decades old. She was born and raised in Roosevelt, brought her children up there, and stayed even when her inability to practice law in Utah gave her ample reason to leave. Roots that run as deep as these cannot be easily duplicated by an unscrupulous future applicant. These roots give us confidence that she will continue to use her legal training to help underserved Utahns.

¶47 The final factor that sets Labrum's case apart is the number and quality of Utah legal practitioners who offer well-founded recommendations of her competence and ethics. We discussed those endorsements above[63] because we view them as speaking primarily to Labrum's competence and ethics. But her ability to persuade so many respected community members of her abilities and merit is another point of differentiation that stands in her favor.

## CONCLUSION

¶48 In describing the standard for granting waivers in *Kelly*, we "emphasize[d] that it is a high bar" and that waivers would only be granted "when a case is truly extraordinary."[64] We reaffirm that

---

(last visited July 10, 2024); Petitioner's Opening Brief, Addendum C, *Letter from Utah State Senator Ron Winterton* (Apr. 12, 2023) (describing the "many open legal positions" in the Uintah Basin, the "overwhelming" caseloads of current attorneys, and the resulting "extreme deprivation of legal representation per capita" in the Eighth Judicial District).

[63] *See supra* ¶¶ 38–40.

[64] *Kelly v. Utah State Bar*, 2017 UT 6, ¶ 10, 391 P.6d 210.

standard today and grant Labrum's petition for waiver because she is one of the rare applicants who can satisfy *Kelly*'s demands. She has shown by clear and convincing evidence that her legal education and experience satisfy the purposes of the rules for which she seeks waiver and that those same factors have prepared her to provide competent and ethical representation to Utah's citizens. The circumstances and choices that shaped her education and experience are distinct and now, because of changed standards for online law schools, unlikely to be replicated. We therefore grant Labrum waiver of rules 14-704(c)(2) and (c)(3) of the Utah Supreme Court Rules of Professional Practice.

───────────

JUSTICE HAGEN, dissenting in the Opinion of the Court:

**INTRODUCTION**

¶49   Our rules of admission to practice law in Utah "stand as important gatekeepers that, in the majority of cases, accurately gauge an applicant's competence to practice law in this jurisdiction." *Kelly v. Utah State Bar*, 2017 UT 6, ¶ 12, 391 P.3d 210. They establish qualifications for people seeking to be admitted to the practice of law that can be fairly and consistently applied to all applicants. And they provide notice of what is required to be admitted to practice in our jurisdiction, allowing applicants to make informed choices. We have previously put applicants on notice that "we will not open the courthouse doors to grant waivers as a more convenient alternative to compliance with the rules." *Id.*

¶50   Here, Labrum was on notice of our rules and made choices regarding her legal education that she knew would foreclose her admission to practice law in Utah State Bar absent a change to our rules. We invited her to petition this court to change its rules seven years ago, yet she never acted on that invitation.

¶51   While we are sympathetic to the challenges Labrum faces, we respectfully disagree with the majority's decision to grant her a waiver of not one but two of our rules of admission. We are especially reluctant where the two rules at issue work together to ensure that an attorney applicant is competent to practice law through a combination of legal education and experience. Labrum cannot establish by clear and convincing evidence that she has satisfied the purpose of each rule because both her education and experience fall far short of our rules' requirements.

## ANALYSIS

¶52 Before analyzing Labrum's waiver request, it is helpful to first understand why Labrum must seek a waiver. We begin with an overview of the rules that Labrum must comply with to become licensed in Utah. Next, we explain the specific ways Labrum fails to satisfy our rules' requirements. Then, we apply the two-part test we adopted in *Kelly* to determine whether a rule waiver is appropriate. *See Kelly v. Utah State Bar*, 2017 UT 6, ¶ 12, 391 P.3d 210. We explain why, in our view, Labrum has not proven by clear and convincing evidence that the purpose of either rule has been satisfied. And, even assuming that Labrum could make the required showing as to the purposes of the rules, we explain why we do not think this is an extraordinary case meriting waiver.

I. OUR RULES OUTLINE AN ALTERNATIVE PATH TO LICENSURE FOR GRADUATES OF LAW SCHOOLS NOT APPROVED BY THE ABA

¶53 Our rules of admission are not secret, and law school applicants have a duty to understand the admission requirements of the jurisdiction in which they wish to practice. Our rules provide a pathway for graduates of both ABA-approved and certain non-ABA-approved schools to become licensed attorneys in our state. *See* UTAH SUP. CT. R. PRO. PRAC. 14-703, 14-704.

¶54 When applicants to our bar association have graduated from a law school that has been "fully or provisionally approved by the ABA," we have confidence that they have received the necessary training to provide competent and ethical representation. *See id.* R. 14-701(e). The ABA sets "Standards and Rules of Procedure for Approval of Law Schools with which law schools must comply to be ABA-approved." *Guide to Schools Seeking ABA Approval*, A.B.A., https://www.americanbar.org/groups/legal_education/accreditation/schools-seeking-aba-approval/ (last visited July 10, 2024). The approval process "is designed to provide a careful and comprehensive evaluation of a law school and its compliance with th[ose] Standards." *Id.* And once a law school is approved by the ABA, it must maintain certain standards to retain its accreditation. *See id.* Because we trust that graduates of ABA-approved law schools have received a competent legal education, they are deemed qualified for admission to the bar association if they pay the required fees, are at least twenty-one years of age, are "of good moral character," have "a proven record of ethical, civil and professional behavior," and have "successfully

passed the MPRE and the Bar Examination." UTAH SUP. CT. R. PRO. PRAC. 14-703.

¶55   Graduating from an ABA-approved law school and taking the bar exam is perhaps the most traditional path to becoming a licensed attorney in most jurisdictions. However, several law schools throughout the country are not approved by the ABA. So states have had to determine whether and how they will allow graduates of non-ABA-approved schools to become licensed in their jurisdiction. Thirty-four states and the District of Columbia allow graduates of non-ABA-accredited law schools to take the bar exam, but many of them also require that the applicant practice law in another jurisdiction before taking the exam, and some impose minimum requirements that the law school must meet. *See Domestic Legal Education: Comprehensive Guide to Bar Admission Requirements*, NAT'L CONF. BAR EXAM'RS, https://reports.ncbex.org/comp-guide/charts/chart-3/#1610142352111-e56b1dc2-06b5 (last visited July 10, 2024).

¶56   There are three general approaches to whether graduates from non-ABA-approved law schools may sit for the bar exam in their state. States that surround Utah provide useful examples of those three approaches. Wyoming and Idaho simply do not allow graduates of non-ABA-approved law schools to sit for their bar exams. *See id.* On the other end of the spectrum, Arizona and New Mexico allow graduates of any non-ABA-approved law school to take the bar exam in their state so long as the applicants have been licensed to practice law in another state for a certain number of years. ARIZ. R. SUP. CT. 34(b)(1)(D). (requiring applicants be "actively engaged in the authorized practice of law . . . for at least three of the last five years"); N.M. R. ADMISSION 15-202(A)(2)(b) (requiring applicants to "show admission to the practice of law in one or more other states for at least four (4) of the six (6) years immediately preceding submission of an application"). Nevada and Colorado take an approach somewhere in the middle by allowing graduates of non-ABA-approved law schools to take their bar exams only if the applicant's law school meets certain criteria and the applicant has practiced in another jurisdiction for a certain number of years. NEV. SUP. CT. R. 51.5(1) (requiring graduates from non-ABA-approved law schools to demonstrate that they have practiced law "for at least ten of the preceding twelve years" and that "the committee on functional equivalency" has certified that the graduates' education met certain requirements); COLO. R. CIV. PROC. 203.4(3)(b) (requiring graduates from non-ABA-approved

law schools to demonstrate that they have practiced law "for three of the five years immediately preceding application for bar examination" and that they graduated from a "state-accredited law school").

¶57  Beginning in 2003, this court followed the approach taken by Wyoming and Idaho. We repealed a rule that allowed certain attorney applicants from non-ABA-approved law schools to take the bar exam, and we began requiring all applicants to graduate from an Approved Law School. *See In re Anthony*, 2010 UT 3, ¶ 4, 225 P.3d 198.

¶58 Then came our decision in *In re Anthony*. There, we considered a rule waiver for an applicant who graduated from Western State University, a law school accredited by the California State Bar Association but not by the ABA. *Id.* ¶ 2. Anthony had been licensed to practice law in California for nearly thirty years before he requested a rule waiver to sit for the bar exam in Utah. *Id.* ¶ 16. We determined that "where an attorney has actively practiced law, without blemish, for nearly thirty years . . . , waiver of the ABA accreditation requirement is appropriate." *Id.* Shortly after, we amended our rules to provide a path for certain graduates of non-Approved Law Schools, like Anthony, to sit for our bar exam. *See* UTAH SUP. CT. R. PRO. PRAC. 14-704(c).

¶59  Our rule change recognized that applicants like Anthony deserve a path to licensure in our state. The amended rule does not require thirty years of experience like Anthony had, but it does require a substantial amount of full-time practice of law to compensate for any gaps in an applicant's education. *Id.* R. 14-704(c)(3). We also set minimum criteria that an Unapproved Law School must meet, including that the school be accredited in the jurisdiction in which it resides. *Id.* R. 14-701(pp). By engaging in the rulemaking process, we were able to hear from community stakeholders and others who would be impacted by the new rule. And our rule change provided a path for more applicants than just Anthony.

¶60  Our current rules take a middle-ground approach similar to that of Nevada and Colorado. We no longer prohibit graduates of non-ABA-approved law schools from sitting for our bar exam, but we do require those graduates to demonstrate competency in additional ways. *See id.* R. 14-701(pp), -704(c)(2)–(3). In addition to showing that they meet the same basic requirements as graduates from an Approved Law School, applicants must show that they

have (1) "graduated with a First Professional Degree in law from an Unapproved Law School located within a U.S. state, territory or the District of Columbia" and (2) "been admitted to the practice of law before the highest court of a U.S. state, territory or the District of Columbia for no fewer than ten years," and have "been Actively and lawfully engaged in the Full-time Practice of Law in one or more jurisdictions where licensed for any ten of the eleven years immediately preceding the filing of the application." *Id.* R. 14-704(c)(2)–(3).

¶61 But not every non-ABA-approved school qualifies as an Unapproved Law School under our rules. An Unapproved Law School must, at minimum, "[1] be accredited in the jurisdiction where it exists, [2] provide legal education that is the substantial equivalent of the legal education provided by an Approved Law School, and [3] not be based on correspondence or internet study." *Id.* R. 14-701(pp). We read this definition as setting the minimum requirements a school must meet for its graduates to qualify to sit for the Utah bar exam.

¶62 Our rules do not provide a pathway to licensure for graduates of Nonqualifying Law Schools that do not meet these minimum requirements. That policy choice represents the court's collective judgment that while an ABA-accredited education is the gold standard, a law school must at least meet our Unapproved Law School requirements for its graduates to have the necessary training to be a licensed Utah attorney. If a school cannot meet the three requirements of an Unapproved Law School, we will be uncertain of the quality of education it provides, so much so that even a substantial practice requirement will be insufficient to make up for the deficits in the applicant's education.

## II. LABRUM FALLS FAR SHORT OF COMPLYING WITH OUR RULES OF ADMISSION FOR GRADUATES OF NON-ABA-APPROVED LAW SCHOOLS

¶63 Although we have established rules providing a path to licensure for graduates of non-ABA-approved law schools, Labrum did not follow that path. First, Labrum's education at Concord Law School meets none of the requirements of an Unapproved Law School education. Second, even if it did, Labrum does not come close to meeting our ten-year practice requirement for graduates of an Unapproved Law School.

HAGEN, J., dissenting

*A. Concord Law School Did Not Meet the Requirements of the Unapproved Law School Rule*

¶64 Our rules of admission dictate that applicants who did not graduate from an Approved Law School must have graduated with a First Professional Degree from an Unapproved Law School in the United States. UTAH SUP. CT. R. PRO. PRAC. 14-704(c)(2). The Unapproved Law School rule has three components: "the law school must [1] be accredited in the jurisdiction where it exists, [2] provide legal education that is the substantial equivalent of the legal education provided by an Approved Law School, and [3] not be based on correspondence or internet study." *Id.* R. 14-701(pp).

¶65 Concord, the school from which Labrum graduated, did not meet any of the three components of an Unapproved Law School at the time she graduated. Two of the three requirements are indisputably lacking: Concord was not accredited in California at the time Labrum graduated, and Concord's curriculum at the time was based on correspondence or internet study. As to the remaining requirement—that the school provide a legal education substantially equivalent to an Approved Law School— we are not persuaded that Concord provided a legal education on par with that offered by ABA-accredited schools.

¶66 But even more than that, we believe that the education Concord provided Labrum fell well below that of an education that an Approved Law School would have provided. The Bar argues, and we agree, that Concord's education was deficient because Concord's admission process was not as rigorous as what the ABA mandates,[65] the school had a high rate of attrition,[66] and it had a

---

[65] The Bar points out that Concord did not require its students to take a "valid and reliable admission test" (such as the LSAT or GRE); instead, applicants need only take a forty-question online test that was not proctored.

[66] ABA Standard 501 requires law schools "only admit applicants who appear capable of satisfactorily completing its program of legal education and being admitted to the bar." *See* STANDARDS & R. OF PROC FOR APPROVAL OF L. SCHS., Standard 501 (A.B.A. 2023), available at https://www.americanbar.org/content/dam/aba/administrative/legal_education_and_admissions_to_the_bar/standards/2023-2024/2023-2024-aba-standards-rules-for-approval.pdf (last visited July 10, 2024). The ABA's

(continued . . .)

very low bar-passage rate for first time exam-takers at the time Labrum graduated.[67] We agree with the Bar that Concord's metrics in these three categories do not meet ABA standards and that these standards are important indicators of a quality legal education.

¶67  At the time Labrum graduated, Concord may have fallen short of other ABA standards as well. The majority addresses some of the standards that the ABA reviews in the accreditation process, such as courses offered and credit hours required to graduate. *Supra* ¶ 29. But the ABA reviews over fifty standards in accrediting schools, and we do not know how many others Concord would have failed to meet. *See generally* STANDARDS & R. OF PROC FOR APPROVAL OF L. SCHS., Standard 501 (A.B.A. 2023), available at

---

interpretation of this standard is that schools should have a non-transfer attrition rate of twenty percent or lower. *See id.* at 34. Concord acknowledges that its attrition rate is "well beyond 20%."

[67]   In July 2017, when Labrum took the California bar exam for the first time, the passage rate for Concord first-time test takers was extremely low (twenty-two percent) as compared to that year's California Bar passage rate for first-time test takers of sixty-two percent. PURDUE GLOB. L. SCH., *Purdue Global Law School California Bar Exam Pass Rates*, 2 (2024) www.concordlawschool.edu/documents/california-bar-exam-pass-rates.pdf (last accessed July 10, 2024). The majority assigns little weight to this data because "the relatively small number of Concord students who actually sit for the bar exam makes an accurate statistical comparison difficult." *Supra* ¶ 30 n.50. For example, the majority notes that "only seven of Labrum's classmates took the California bar exam for the first time in October 2020." *Supra* ¶ 30 n.50. But when Labrum first sat for the California bar exam in July 2017, she was among eighteen Concord graduates taking the exam for the first time. Only four passed. If we need a larger sample size, we could consider Concord's first-time bar passage rate for all exams administered between the first and last time Labrum sat. Between July 2017 and October 2020, 115 Concord graduates took the California bar exam for the first time. PURDUE GLOB. L. SCH., *Purdue Global Law School California Bar Exam Pass Rates*, 2–3 (2024) www.concordlawschool.edu /documents/california-bar-exam-pass-rates.pdf (last accessed July 10, 2024). Thirty-one of those graduates passed on their first attempt, for a first-time passage rate of twenty-six percent, *see id.*, only slightly higher than the twenty-two percent in July 2017.

https://www.americanbar.org/content/dam/aba/administrativ
e/legal_education_and_admissions_to_the_bar/standards/2023-
2024/2023-2024-aba-standards-rules-for-approval.pdf (last visited
July 10, 2024). For instance, the ABA sets out guidelines about
faculty responsibilities and attendance requirements, which
Labrum does not address. *See id.* at 30 (requiring full-time faculty
to teach "substantially all of the first one-third of each student's
coursework").

¶68  From the evidence before us, we know that Labrum's law
school training fell short of the education that she would have
received at an Approved Law School. But we cannot know all of
the ways Labrum's education was deficient because, as an entirely
online law school, Concord was not even eligible to go through the
ABA or California accreditation processes. This is not to say that
the *only* reason Concord was not accredited by the ABA or by
California is because it was online. We have noted several ABA
standards that Concord did not meet at the time Labrum attended,
and Concord remains unaccredited by the ABA today, even though
there are now several ABA-approved law schools that offer online
and hybrid J.D. programs.

¶69 And although Labrum highlights Concord's current
accreditation by California, she has not shown that Concord offered
the same quality of education when she attended the school. In
short, Labrum has not demonstrated that Concord would have met
the other two requirements of an Unapproved Law School—state
accreditation and a legal education substantially equivalent to an
ABA-accredited school—but for the third requirement that the
program not be based on internet study.

*B. Labrum Fails to Meet Our Practice Requirement for Graduates of an
Unapproved Law School*

¶70  Even if we set aside the fact that Labrum graduated from
a Nonqualifying Law School, she would still fall short of
compliance with our rules because she also does not meet the
practice requirement imposed on graduates of Unapproved Law
Schools. Our rule requires that all such applicants be "admitted to
the practice of law before the highest court of a U.S. state, territory
or the District of Columbia for no fewer than ten years," and
"Actively and lawfully engaged in the Full-time Practice of Law in
one or more jurisdictions where licensed for any ten of the eleven
years immediately preceding the filing of the application." UTAH
SUP. CT. R. PRO. PRAC. 14-704(c)(3).

¶71 Labrum is licensed in California, but she does not meet any of the other components of the practice requirement. First, she has not been licensed for at least ten years. Although Labrum graduated from Concord in 2017, she was not admitted to practice law in California until April 2021, less than two years before she began the process to petition for a rule waiver.[68] Second, she has not been actively and lawfully engaged in the full-time practice of law. Labrum has been working as a law clerk and mediator, neither of which qualify as the practice of law. Labrum points to her pro bono representation of four clients in Utah as part of her legal experience, but she has not demonstrated that her work in those cases amounted to the full-time practice of law. *See* UTAH SUP. CT. R. PRO. PRAC. 14-803 (allowing attorneys licensed and in good standing in other states to provide pro bono legal services only in a limited capacity). Third, she has not been practicing in the jurisdiction where she is licensed. She has never practiced law in California, where she would have been subject to the duties and ethical responsibilities of a lawyer. Fourth, she has not practiced for ten of the eleven years immediately preceding the filing of her application. At the time she started the process to petition for a rule

---

[68] We agree with the majority, *see supra* ¶ 33 n. 54, that the clock for Labrum's experience cannot begin to tick until she was licensed in April 2021. And the clock stopped when she asked to sit for the Utah bar exam. Our rule requires applicants who graduated from an Unapproved Law School be "Actively and lawfully engaged in the Full-time Practice of Law in one or more jurisdictions where licensed for any ten of the eleven years *immediately preceding the filing of the application*." UTAH SUP. CT. R. PRO. PRAC. 14-704(c)(3) (emphasis added). One month after becoming licensed in California, Labrum inquired about applying for the Utah bar exam. The Bar informed her that she was not eligible for admission to the bar association because she could not satisfy the practice requirement. In November 2022, Labrum requested that the Bar formally deny her the opportunity to apply so she could petition this court for a waiver. Technically, Labrum has not filed an application to take the bar exam since becoming a licensed attorney, but we interpret her request for denial from the Bar in November 2022 as "the application" for purposes of determining how long she was practicing "immediately preceding the filing of the application." *Id.*

waiver, she had less than two years of law-related work experience since becoming licensed in 2021.

¶72   Even if Labrum met the other requirements of the practice rule, the fact that she has less than two of the ten required years of experience should still give us pause when considering her waiver petition. But she is not merely lacking in years of experience. Other than having a California law license, she meets none of the requirements of the practice rule.

¶73   To grant Labrum's petition, we would have to overlook all the ways in which she fails to meet the two rules of admission that she asks us to waive. We point out the ways that Labrum's education and experience fail to meet the requirements in our rules only to demonstrate that she is not asking us to overlook one unique shortcoming. Instead, she is asking the court to overlook numerous shortcomings in both her legal education and legal experience.

### III. WE WOULD DECLINE LABRUM'S REQUEST FOR A RULE WAIVER BECAUSE SHE HAS NOT CONVINCED US BY CLEAR AND CONVINCING EVIDENCE THAT SHE MEETS THE PURPOSES OF OUR RULES OF ADMISSION OR THAT HER CIRCUMSTANCES ARE EXTRAORDINARY

¶74   We have previously explained that when applicants for admission to the practice of law seek waiver of one of our rules, they must prove that they satisfy the purpose of the rule and that their circumstances are unique. *Kelly v. Utah State Bar*, 2017 UT 6, ¶ 10, 391 P.3d 210. In *Kelly*, we considered whether to admit an attorney applicant who had graduated from a Canadian law school but had not obtained additional education at an ABA-approved law school, which our rules require. *Id.* ¶ 1. We set out, for the first time, a test governing "when we will exercise our authority to grant a petition for waiver." *Id.* ¶ 9. We will waive a rule of admission (1) when "an applicant demonstrates by clear and convincing evidence that the purpose of a particular rule contemplated for waiver has been satisfied," and (2) "only in extraordinary cases"—i.e., when "the applicant's background and experience . . . distinguish him [or her] from other applicants." *Id.* ¶¶10, 12. We emphasized "that we hold absolute discretion in deciding when to waive one of our admission rules." *Id.* ¶ 12. But we put future applicants "on notice" that waivers were not a "convenient alternative to compliance with the rules" and that "we may decline to waive our rules" if either element of our test is not met. *Id.*

¶75   We then applied the test to Kelly. In evaluating whether Kelly satisfied the purpose of the supplemental education rule, we stated that a "manifest purpose" of requiring that applicants with foreign law degrees have additional education from ABA-approved law schools was "to ensure that attorneys admitted to practice in this state have been sufficiently educated in . . . identified areas of U.S. law." *Id.* ¶ 13. In evaluating whether Kelly had satisfied that purpose, we considered two "common sense guideposts": (1) whether his foreign law school education "was functionally equivalent to the education provided at ABA-approved schools," and (2) "the extent to which he ha[d] been exposed to U.S. law." *Id.* ¶¶ 14–15 (cleaned up).

¶76   We first determined that we could not "conclude on the available evidence that Toronto law school provides an education that is functionally equivalent to the education provided at an ABA-approved law school" because Kelly "did not receive the same extensive instruction in U.S. law that a graduate from an ABA-approved law school would receive." *Id.* ¶ 16. Although we could not conclude that Kelly's education was "functionally equivalent" to what he would have received at an ABA-approved law school, we noted that "the second factor in our analysis of [the applicable rule]—an applicant's exposure to U.S. law—may compensate for deficiencies in the record regarding the nature and quality of the education afforded by a foreign law school." *Id.* ¶ 17. We concluded that Kelly's roughly twelve years of practice in Massachusetts showed that he had been "thoroughly exposed to U.S. law." *Id.* ¶ 18. Accordingly, we concluded that Kelly had shown by clear and convincing evidence that he satisfied the purpose of the supplemental education rule, and in light of his "unique background and experience," we granted the requested waiver. *Id.* ¶ 21.

¶77  The analysis in *Kelly* acknowledges that our rules of admission each serve an important role in determining whether an applicant is competent to practice law in Utah. *See generally id.* We took the rule at issue—the requirement that applicants educated at a foreign law school supplement their education with courses from an ABA-approved law school—and surmised its purpose within the fabric of our rules of admission as a whole. In other words, we did not simply step back and assess whether, in our view, Utahns could rely on Kelly for competent and ethical legal representation. Rather, we looked more closely at his experience and determined that his exposure to U.S. law in practice was comparable to that of

a foreign attorney applicant who had received supplemental education from an ABA-approved law school.

¶78 Below, we apply the *Kelly* framework to Labrum's education and legal experience. Labrum has not convinced us by clear and convincing evidence that she meets the purposes of the Unapproved Law School rule or the practice rule. And even if she had convinced us that she meets the purposes of these rules, she has not convinced us that her circumstances are so extraordinary that they warrant a waiver of our rules.

### A. Labrum Does Not Meet the Purposes of the Unapproved Law School Rule or the Practice Rule

¶79 To clear the first hurdle in the *Kelly* standard, Labrum must demonstrate "by clear and convincing evidence that the purpose of a particular rule contemplated for waiver has been satisfied." *See id.* ¶ 10. Before applying that standard to the facts presented by Labrum's petition, we note an important way in which our analysis differs from that of the majority.

¶80 The majority cites *Kelly* for the proposition that, in evaluating the first waiver requirement, "we will not merely consider whether an applicant has satisfied the purpose of a particular rule—which may be narrow," but "will also 'consider more globally an applicant's competence to practice law.'" *Supra* ¶ 14 (quoting *Kelly*, 2017 UT 6, ¶ 11). But the language quoted by the majority addresses the second step of the analysis, not the first. The full context of the quote makes the distinction clear: "*In assessing whether a particular case is extraordinary*, we will not merely consider whether an applicant has satisfied the purpose of a particular rule—which may be narrow. Instead, we will consider more globally an applicant's competence to practice law." *Kelly*, 2017 UT 6, ¶ 11, (emphasis added). In conducting the first step of the analysis, we do not read *Kelly* as endorsing an approach that would allow us to go beyond the purpose of the particular rule and consider whether the applicant is generally competent to practice law.

¶81 Considering the applicant's overall competence only after she has established that the purpose of the specific rule is satisfied makes sense within the framework of our rules. Presumably, each rule we have adopted serves a particular purpose. Otherwise, we would be creating arbitrary barriers to the practice of law. And if we waive those rules for any applicant who can convince us that she is generally competent to practice law, we lose "a predictable,

objective standard" for measuring competence and are left with an ad hoc, subjective approach that risks arbitrary application. *Spencer v. Utah State Bar*, 2012 UT 92, ¶ 17, 293 P.3d 360.

¶82   Accordingly, we examine each rule at issue and evaluate whether Labrum has "demonstrate[d] by clear and convincing evidence that the purpose of *a particular rule* contemplated for waiver has been satisfied." *Kelly*, 2017 UT 6, ¶ 10 (emphasis added).

¶83   While we address each rule separately, we agree with the majority that the Unapproved Law School rule and the practice rule work hand in hand. As the majority puts it, the broader purpose behind these two rules "is to ensure that applicants for admission have received an education of sufficient quality that, when combined with the practice requirement and passage of the bar exam and MPRE, we can be confident that they have learned the material that will help them offer competent and ethical representation." *Supra* ¶ 27.

¶84   In assessing whether an applicant is qualified to sit for the Utah bar exam, our rules place legal education and law practice at opposite ends of a sliding scale. Where the showing on one factor is weak, a strong showing on the other factor is necessary to compensate for the shortcoming. For example, applicants with an Approved Law School education do not have to practice law before they can take our bar exam because their education, on its own, suffices. On the other hand, applicants of Unapproved Law Schools must meet the practice requirement to compensate for the deficiencies in their education. If an applicant has an education that falls below the already lowered requirements of an Unapproved Law School, it stands to reason that the applicant would need even *more* experience practicing law to compensate for the greater deficiencies in the applicant's education.

¶85   In our view, Labrum has not demonstrated by clear and convincing evidence that she meets either the specific purposes of our Unapproved Law School rule, practice rule, or the broader purpose of the two rules working in tandem. We first address whether she has met the purpose of the Unapproved Law School rule and then turn to whether she has met the purpose of the practice rule.

1. Labrum Has Not Shown by Clear and Convincing Evidence that She Satisfies the Purpose of the Unapproved Law School Rule, Which Is to Ensure that Applicants Have Received a Minimally Sufficient Legal Education

¶86   In 2011, following our decision in *In re Anthony*, 2010 UT 3, 225 P.3d 198, we amended the rules to add a path to licensure for applicants who did not graduate from an Approved Law School. *See* UTAH SUP. CT. R. PRO. PRAC. 14-704(b) (2011). The new rule applied only to licensed attorneys with at least ten years of practice who passed the Utah bar exam and met all other requirements. *Id.* Yet the court still required these applicants to have a legal education that met certain minimum requirements. Specifically, the Unapproved Law School needed to be "accredited in the jurisdiction where it exists," provide the "substantial equivalent of the legal education provided by an approved law school," and could "not [be] based on study by correspondence or by internet study." *Id.* R. 14-704(b)(3). Each of those three requirements gives insight as to what the court deemed essential components of a legal education.

¶87  First, by requiring that an Unapproved Law School be accredited in the jurisdiction in which it exists, the rule ensures that although the school lacks ABA approval, some independent body has reviewed the pedagogy and curriculum of the school and deemed it adequate for residents of the jurisdiction in which it sits. That type of evaluation is not something this court is well equipped to do on a case-by-case basis. Oversight in the form of accreditation also provides some level of consumer protection for students and future bar applicants.

¶88  Second, by requiring that the Unapproved Law School provide an education that is substantially the same as an education provided by an Approved Law School, the rule ensures that the school is educating and equipping its students to competently practice law. This requirement also prevents schools that are providing sham J.D. degrees from claiming that the degree they provide will sufficiently prepare their graduates to take our bar exam.

¶89  Third, professionals and organizations within the legal community have historically been concerned about the quality of education that an online school could provide and the missed opportunity for experiential learning. Traditionally, the ABA did not allow schools that use distance learning to go through the

accreditation process because it wanted to "preserv[e] the face-to-face instruction and classroom interaction that has proven so successful in legal education." Laura N. Gasaway, *Distance Learning Survey*, 29 SYLLABUS 16 (1998). When the ABA first started allowing law schools to use some distance learning components, the ABA surveyed law schools around the country about potential drawbacks in distance learning. *See id.* The schools indicated that distance learning presented concerns such as quality of education, pedagogical soundness, and preserving the interaction between faculty and students. *See id.*

¶90 Beyond the qualitative concerns of an online legal education, virtual learning drastically limits or eliminates in-person interactions that students might have with legal professionals and peers. The practice of law is more than just submitting written documents. Much of the practice of law requires attorneys to interact with peers, judges, and clients. Members of the legal community feared that legal education "loses something vital when students learn in isolation." Pam Mendels, *Skepticism About Online Law Degrees from a Supreme Court Justice*, N.Y. TIMES (Oct. 1, 1999), *available at* https://archive.nytimes.com/www.nytimes.com/library/tech/99/10/cyber/cyberlaw/01law.html (quoting Justice Ruth Bader Ginsburg).

¶91 Our rule's requirement that an Unapproved Law School education not be based on correspondence or internet study likely came from a place that mirrors some of the concerns that the ABA and the larger legal profession had about online study at the time. And while we might agree that the rule banning internet study should be updated to reflect modern attitudes toward and advancements in remote learning, the best way to address that would be through a rule change that would benefit Labrum and all other similarly situated applicants. Granting an individual waiver to Labrum before the proposed rule change short-circuits the process.

¶92 While each part of the Unapproved Law School rule reflects a distinct policy choice about the necessary components of a sufficient legal education, the unifying purpose of these requirements is to ensure that all applicants have received a formal legal education that is not seriously lacking. Unlike California, we do not allow applicants to sit for our bar exam without any law school education. *See, e.g.*, UTAH SUP. CT. R. PRO. PRAC. 14-704(c)(2). And unlike Arizona and New Mexico, we do not allow a graduate

of any law school to sit for our bar exam so long as they are licensed elsewhere and meet our practice requirement. We have made a policy judgment that a J.D. from an acceptable law school is an indispensable qualification for a Utah attorney.

¶93 The Unapproved Law School rule acknowledges that a school without ABA approval will likely have some deficiencies. But the rule's requirements are designed to minimize the risk that those deficiencies are so serious that they undermine the purpose of requiring all attorneys to have a formal legal education. To determine whether Labrum has satisfied the purpose of the rule, we must assess whether she has shown by clear and convincing evidence that, despite not meeting the definition of an Unapproved Law School, her legal education had no serious deficiencies.

¶94 In our view, Labrum has not met that burden. We have already identified several red flags that suggest serious deficiencies in Labrum's education, including Concord's twenty-two percent bar passage rate at the time Labrum graduated compared to California's average passage rate of sixty-two percent. PURDUE GLOB. L. SCH., *Purdue Global Law School California Bar Exam Pass Rates* (May 2024), www.concordlawschool.edu/ documents/california-bar-exam-pass-rates.pdf (last visited July 10, 2024). This makes us question whether Concord adequately prepared its graduates for entering the legal profession. Plus, Concord could have been seriously deficient in other ways, but because it was not eligible for the accreditation process, we have no objective evaluation of the quality of education it provided.

¶95 Labrum could potentially overcome the deficiencies in her education with adequate experience practicing law, but we start the second step of the *Kelly* analysis with the cursor of our sliding scale at the very low end of education. In other words, her education has enough deficiencies that she would likely need *more* time practicing law than our rules require to compensate for her legal education.

2. Labrum Cannot Prove by Clear and Convincing Evidence that She Meets the Purpose of the Practice Requirement—That Her Experience Is Extensive Enough to Make up for Gaps in Her Legal Education

¶96 The Unapproved Law School rule works in conjunction with the practice rule. Because graduates of an Unapproved Law School presumably received a lesser education than graduates of an Approved Law School, we require graduates of an Unapproved Law School to engage in the full-time practice of law to make up

for any shortcomings in their education. In other words, we agree with the majority that the purpose of rule 14-704(c)(3), at least in part, "is to ensure that applicants have enough experience to make up for whatever gaps their education at an Unapproved Law School may have left unfilled." *Supra* ¶ 33. Applicants will satisfy this purpose when they have current and substantial experience practicing law full time in the licensing jurisdiction, which establishes a demonstrated record of practicing law while complying with the governing rules of professional conduct. *Cf. Spencer*, 2012 UT 92, ¶ 13 (determining that the purpose of the requirement that applicants for admission by motion practice for at least three out of the previous four years "ensures that an applicant's legal experience is both current and substantial," and that the applicant "remains currently competent and in good standing").

¶97 Labrum has not proven that she has current and substantial experience in the full-time practice of law or a demonstrated ability to comply with the rules of professional conduct. We have previously acknowledged that "legally oriented duties performed in Utah are not the equivalent of substantial and lawful practice of law in a jurisdiction where [a] petitioner has been admitted." *In re Gobelman*, 2001 UT 72, ¶ 8, 31 P.3d 535, *distinguished on other grounds by In re Anthony*, 2010 UT 3. In *Gobelman*, the petitioner sought approval from the Utah Supreme Court to sit for the attorney bar exam. *See id.* ¶ 1. Gobelman was licensed to practice law in California but worked in Utah as a court administrator for several years and never practiced law in California. *Id.* ¶ 5. At the time, our rules required that applicants for the attorney bar "complet[e] at least four years of law practice in the admitting jurisdiction." *Id.* ¶ 7. Gobelman argued that "his legally oriented duties as a court administrator [were] demonstrative of his legal skills." *Id.* ¶ 8. We found that his work as a court administrator was not the same as practicing in a jurisdiction where he had "the benefit of the legal authority to practice law." *Id.*

¶98 Labrum's mediator and law clerk experience is more analogous to Gobelman's court administrator experience than it is to the practice of law. Acting as a mediator or working as a law clerk does not amount to practicing of law. As a law clerk, the ultimate responsibility for Labrum's work is borne entirely by her supervising attorneys. Unlike the practice of law in the licensing jurisdiction, it does not establish a record of complying with her

ethical obligations as an attorney. Similarly, even though mediators act under best practice guidelines, those guidelines are not comparable to an attorney's fiduciary duties to clients and the obligations owed to the profession, the courts, and the public. *Cf.* UTAH STATE COURTS, THE UTAH MEDIATION BEST PRACTICE GUIDE 1 (Apr. 2023) (stating that the guidelines "do[] not have the force of law and [are] not to be used for disciplinary purposes").

¶99   We recognize that Labrum has some limited experience practicing law pro bono pursuant to Utah Supreme Court Rule of Professional Practice 14-803. While we commend Labrum for undertaking pro bono representation, her experience on this front is not enough to compensate for the deficiencies in her education by demonstrating her ability to competently practice law and adhere to the rules of professional conduct. Her track record is simply too short.

¶100   Even if we were to accept her pro bono representation, law clerk duties, and mediator experience as equivalent to the full-time practice of law in the licensing jurisdiction, we are not convinced that Labrum has been working long enough to make up for the gaps in her legal education. She applied to take the Utah bar exam less than two years after obtaining her California law license. Less than two years of experience is a far cry from the ten years of practice our rules require.

¶101   In assessing whether Labrum has "enough experience to make up for whatever gaps [her] education at an Unapproved Law School may have left unfilled," *supra* ¶ 33, the majority does not account for the fact that Labrum graduated not from an Unapproved Law School but from a Nonqualifying Law School, *see supra* ¶¶ 33–40. In our view, this approach overlooks the interplay between the Unapproved Law School rule and the practice rule. Because the majority is waiving the Unapproved Law School rule, satisfying the purpose of the practice rule takes on even more importance. On our sliding scale, the concerns with the quality of Labrum's education need to be offset by her experience.

¶102   The majority cites three characteristics of Labrum's work during the relevant two-year period to show that her work experience has made up for deficiencies in her legal education: her work demonstrates that she is familiar with Utah law, her law clerk experience has helped her to build skills relevant to being an attorney, and several Utah attorneys have asserted that they believe

she is ready to practice law in Utah. *Supra* ¶¶ 34, 36, 38. We do not find these factors compelling.

¶103 First, the majority gives Labrum's experience more weight because it took place in Utah and demonstrates that she has gained familiarity with Utah law and procedure. *Supra* ¶ 34. But the attorney practice rule is not aimed at ensuring an applicant's understanding of Utah law; it expressly requires practice outside of Utah in the applicant's licensing jurisdiction. *See* UTAH R. PRO. PRAC. 14-704(c)(3). And this case is readily distinguishable from *Kelly*, where we analyzed an applicant's familiarity with U.S. law to determine whether he satisfied the purpose of the supplemental education requirement. *See* 2017 UT 6, ¶¶ 14–18. The rule at issue in *Kelly* required an applicant with a foreign law degree to obtain additional hours of education from an ABA-approved law school, the purpose being to assure the applicant's familiarity with U.S. law. *Id.* ¶ 13. That is not the purpose of the practice rule that Labrum asks us to waive in this case.

¶104 Next, while we agree with the majority that law clerk experience is helpful in developing some of the skills needed to be an attorney, *supra* ¶ 36, law clerk duties are not the same as attorney duties. For instance, while they can create initial drafts of filings, law clerks do not sign off on final versions of those filings. Someone else's name is associated with the filing, and that attorney is responsible for its contents. Law clerks also do not make big-picture strategic decisions about the progression of a case or have the same level of authority to act on behalf of clients as attorneys do. Law clerks do not owe fiduciary duties to clients and are not charged with complying with the rules of professional conduct, court rules, and orders or directives of the court. Our practice rule requires a significant amount of time engaged in the licensed practice of law because satisfaction of that requirement demonstrates that the applicant can fulfill the important duties of being an attorney. Even if Labrum had ten years of experience as a law clerk, it would not satisfy that purpose.

¶105 Finally, we do not believe that Labrum's letters of recommendation from Utah practitioners have any bearing on whether she has satisfied the purposes of the practice requirement. *Supra* ¶ 38. These letters seek to demonstrate the quality of Labrum's work or the ways in which she is familiar with Utah law, but they do not establish that she has current and substantial experience practicing law in a jurisdiction in which she is licensed.

Her general competence to practice law might be relevant to whether this is an extraordinary case meriting a waiver, but it does not demonstrate that the purpose of the practice rule has been satisfied. Labrum's work does not demonstrate a sufficient quality or quantity of experience to compensate for the concerns we have about the education she received. Namely, her law-adjacent experience in Utah over the course of less than two years does not convince us that she has current and substantial experience practicing law. Nor does her experience convince us that she has practiced law in a way that provides a track record of complying with the professional and ethical obligations of a lawyer. She simply lacks enough experience in the full-time, licensed practice of law to convince us that she meets the purpose of our practice requirement.

*B. Labrum's Circumstances Are Not Extraordinary*

¶106   Because we would conclude that Labrum has not shown by clear and convincing evidence that she meets the purpose of either rule, we would not reach the question of whether this is an extraordinary case where we should grant a waiver. Regardless, we are not persuaded that Labrum has shown that hers is an extraordinary case. The standard we set out in *Kelly* allows us to grant a waiver "only in extraordinary cases," when "the applicant's background and experience . . . distinguish him [or her] from other applicants." 2017 UT 6, ¶¶ 10, 12. When we assess "whether a particular case is extraordinary," "we will consider more globally an applicant's competence to practice law." *Id.* ¶ 11. Simply put, Labrum must demonstrate to us that her background and experience are different from those of other applicants in a way that is relevant to establishing her overall competence to practice law. We do not believe that the factors cited by the majority make this an extraordinary case.

¶107   First, the majority concludes that Labrum's experience is unique because individuals going to law school now have the option of attending fully remote, ABA-approved law schools. *Supra* ¶ 43. But that option only applies to future law school applicants. It does not distinguish Labrum from all other applicants who graduated from Unapproved or Nonqualifying Law Schools in the past who do not meet our practice requirement.

¶108   Going forward, future law students can apply to one of a handful of ABA-accredited online law schools, but that does not mean that every student who wants to attend those schools will be

41

admitted and able to pursue that option. Applicants who are not admitted to an online school or who are "unable to commute or relocate to a city with an accredited school" willing to admit them will still be "forced to choose between attending an unaccredited online law school or finding another line of work." *See supra* ¶ 42.

¶109   As we see it, the "difficult choice" Labrum faced has not "disappeared entirely." *See supra* ¶ 43. Many prospective law students will still have to decide whether they are willing to relocate to a city where they have been admitted to an accredited law school or whether they will take their chances with an unaccredited online option. And before 2021, all prospective students who lived outside commuting distance of an accredited law school had to make that choice. For those students who chose not to relocate and graduated from an online law school in the last ten years, each and every one of them would need a waiver of our ten-year practice rule to sit for the Utah bar exam. If we include those who did not immediately become licensed or continuously practice law after licensure, the list of potential waiver applicants grows even longer. The choices Labrum faced when applying for law school are not sufficiently unusual to distinguish her from other applicants.

¶110   Next, the majority views Labrum's decision "to stay in Utah and work as a mediator and law clerk" as something that "sets this case apart," because "most law graduates who are admitted to practice law in a state will go on to practice law in that state." *Supra* ¶ 44. But the fact that Labrum has not practiced law in the state where she was admitted is a large part of why she needs a waiver. Every applicant seeking a waiver of our practice rule because they have not practiced in their licensing state would be in the same boat. The very circumstance that necessitates a waiver of our rules does not, in our view, make the case extraordinary.

¶111   The majority also places weight on Labrum's expressed desire to work in an area of Utah that is underserved. *Supra* ¶¶ 45–46. While our state has a great need for lawyers in rural areas, and we applaud Labrum's desire to serve her local community, we do not see the relevance to our decision to waive our admission rules. The Bar points out that a Utah bar license allows an attorney to practice anywhere in the state, and that Labrum is not bound by her current intention to remain in Roosevelt. But more fundamentally, if the court would not grant Labrum's waiver had she wanted to practice at a corporate firm in Salt Lake City, it

should not grant the waiver simply because Labrum intends to work for an underserved population. Clients in rural Utah deserve the same level of professional competence that we demand of all lawyers in our state. And to ensure our rules are applied fairly and neutrally, we should not give preferential treatment to those lawyers who choose to pursue what we as justices might deem to be worthwhile endeavors.

¶112 Finally, while we agree that the letters of recommendation weigh in favor of a general determination of competency, we question whether we should ascribe much weight to them. We recognize that this court has looked to letters of recommendation in the past, *see, e.g.*, *In re Anthony*, 2010 UT 3, ¶ 16, but we see that practice as potentially problematic. Presumably, this court must determine what weight to give those letters, which might vary based on our familiarity with the recommending attorneys or the reputation of the law firm at which they practice. Even more concerningly, a letter of recommendation system stands to benefit applicants who have attorneys or other influential people in their social network, something that not every aspiring lawyer is likely to have. Placing weight on letters of recommendation moves our system of admission away from a neutral system of evaluation into one that could potentially be infected with personal bias or benefit only a select number of applicants.

¶113 The majority says that it gives weight to Labrum's letters of recommendation because the letters "come from lawyers who have observed Labrum's legal work," and that letters from influential people in an applicant's social network "would not warrant the same treatment." *Supra* ¶ 39 n.56. While many of the letters come from attorneys and supervisors of Labrum's legal-adjacent work, some of the letters Labrum submitted are from influential community members, such as a Utah state senator and a district court judge, who only speak to their knowledge of Labrum personally and the legal landscape of Roosevelt, Utah.

¶114 Interpreting letters of recommendation is an inherently subjective process. The value of a letter of recommendation lies not only in the content of the letter but also in the identity of the writer. The writer's own reputation and relationship to the subject can impact the weight this court might give to a particular letter. The uncertainty of weighing letters of recommendation underscores the difficulty in trying to assess competence untethered from our rules.

It is a necessarily subjective exercise that we should avoid in all but the rarest cases. This is not one of those cases.

## CONCLUSION

¶115 We respectfully dissent from the court's decision to grant Labrum's waiver petition. In the interest of procedural fairness, this court has previously stated that we will waive our rules only in extraordinary cases. Labrum has not convinced us by clear and convincing evidence that we should waive the rules of admission for her.

¶116 And even if we denied her petition for waiver, Labrum would not be without remedy. As we indicated the first time she requested a waiver, she could petition this court to amend its rules—an option that would benefit all similarly situated applicants and would allow us to incorporate feedback from various stakeholders and community members. She could also attend an Approved Law School. As the majority notes, there are now ABA-accredited online law school programs, and obtaining a three-year law degree from an accredited institution would be a quicker path to licensure than satisfying our ten-year practice requirement. Or she could gain the necessary experience practicing law in California and then seek a waiver of only the Unapproved Law School rule. But at this point, Labrum is not close to satisfying either the letter or the spirit of our rules. Under these circumstances, we would deny the petition.

---